[Cite as *In re P.J.M.*, 2025-Ohio-2124.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF | : | JUDGES: |
| | : | Hon. Craig R. Baldwin, P.J. |
| P.J.M. (DOB 7/15/21) | : | Hon. William B. Hoffman, J. |
| D.M.  (DOB 1/03/23) | : | Hon. David M. Gormley, J. |
| | : | |
| | : | |
| | : | Case Nos. 2024CA0027 |
| | : | 2024CA0028 |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Coshocton County
Court of Common Pleas, Juvenile
Division, Case Nos. 20233004 and
20233005

JUDGMENT:     Affirmed

DATE OF JUDGMENT:     June 16, 2025

APPEARANCES:

For Plaintiff-Appellant Mother

DIANA E. DUDGEON
Dudgeon & Nabors Law Group
141 Front Avenue SE
New Philadelphia, Ohio 44663

For Father

RICHARD D. HIXSON
3808 James Court, Suite 2
Zanesville, Ohio 43701

For Defendant-Appellee
Guardian ad Litem

JEANETTE MOLL
45 North 4th Street
Zanesville, Ohio 43701

For Coshocton County JFS

KATELYNN DAVID
300 North 3rd Street, Suite A
Coshocton, Ohio 43812

*Baldwin, P.J.*

{¶1} The appellant, T.M., appeals trial court's decision to terminate her parental rights and grant permanent custody of P.J.M. and D.M. to Coshocton County Job and Family Services ("the Agency"). The appellee is the children's guardian ad litem.

## STATEMENT OF THE FACTS AND THE CASE

{¶2} On July 15, 2021, P.J.M. was born. On January 3, 2023, D.M. was born. The appellant is the biological mother of P.J.M. and D.M. ("the children"). N.M. is the biological father of the children.

{¶3} On or about January 20, 2023, the Agency filed complaints alleging that the children were dependent under R.C. 2151.04 and neglected under R.C. 2151.03.

{¶4} On February 13, 2023, the trial court issued a Pre-Dispositional Interim Order, placing the children in the temporary custody of the paternal grandparents with the Agency's protective supervision.

{¶5} On March 24, 2023, the appellant and N.M. entered admissions to dependency of the children under R.C. 2151.04(C).

{¶6} On May 10, 2023, the Agency removed the children from the grandparents' temporary custody.

{¶7} On May 11, 2023, the trial court held a shelter care hearing where they granted the Agency temporary custody of the children. They were placed in a foster home.

{¶8} On January 10, 2024, upon the Agency's motion, the trial court extended the Agency's temporary custody for six months.

{¶9} On January 22, 2024, the appellant gave birth to twins. The Agency filed neglect and dependency claims on them as well.

**{¶10}** On May 16, 2024, the appellee filed a motion for permanent custody of the children.

**{¶11}** On May 23, 2024, the Agency filed a notice with the trial court stating that it did not object to the appellee's motion for permanent custody.

**{¶12}** On August 12, 2024, the trial court held a hearing on the appellee's motion for permanent custody.

**{¶13}** First, B.Y. testified that she is the foster mother of D.M. and P.J.M. P.J.M. is three years old and has been living with her since May of 2023. P.J.M. is outgoing and very intelligent. She is hitting all her milestones and has good motor skills. She enjoys spending time with her foster family and extended foster family. She has formed a strong bond with her foster family.

**{¶14}** D.M. has also lived with B.Y. since May of 2023. He is one and a half years old. He was diagnosed with infantile nystagmus, an imbalance between the brain and the eyes. It affects his motor skills and how well he will see. He had one surgery in April of 2024. He is healing well from the surgery, but doctors are recommending a second surgery.

**{¶15}** D.M. was born eight weeks prematurely. He was born at home and taken to the hospital due to breathing issues. D.M. was also born going through withdrawal from drug exposure. D.M. has significant medical needs and must attend many medical, vision, and physical therapy appointments.

**{¶16}** D.M. has bonded and is attached to his foster family.

**{¶17}** The foster parents are both licensed to adopt, and they intend to adopt the children if the trial court grants the motion for permanent custody. They are willing to

continue the medical treatments and appointments and are prepared to provide for all their future needs.

**{¶18}** In the summer of 2024, N.M. suggested to the foster parents that they meet at the Coshocton Balloon Festival "outside of the case." The foster parents denied his request and reported the incident to the Agency. The incident occurred after the appellee had filed the motion for permanent custody. T.M. was not involved in the incident.

**{¶19}** Elizabeth Ballantine testified she has worked at the Agency for four and a half years. Ms. Ballantine testified that the Agency filed a complaint regarding the children's older half-sibling, J.B. The children's mother was living with J.B., and there were concerns of domestic violence between the mother and father. In an incident between J.B. and T.M., J.B. received a black eye. There were other reports of T.M. physically assaulting J.B. J.B. had two siblings who also suffered medical and educational neglect from T.M., their mother. They were not attending school, and there were housing and substance use issues with the parents. The appellant refused the Agency access to the home for seventy days. One of the children missed an entire year of school during that time.

**{¶20}** The appellant was also the mother of the children's other half-sibling, J.M. The Agency became involved with J.M.'s case because of her previous history with J.B. and his two siblings and prenatal drug use. J.M. was born drug-dependent. The Agency removed J.M. from the appellant's custody, and the trial court granted permanent custody to the Agency. The appellant did not participate meaningfully in J.M.'s case plan and tested positive for methamphetamines in February of 2022.

**{¶21}** The children also have a half-sibling A.A. The trial court granted Legal custody of A.A. to A.A.'s father. His testimony showed that the appellant made threats toward A.A. and the child's father. The appellant tried to poison A.A. and the child's father with mineral oil, and the appellant physically assaulted A.A.'s father.

**{¶22}** Ms. Ballantine testified that the appellant has nine minor children, none of whom were under her care at the time of the hearing.

**{¶23}** Next, Lexi Thompson testified she is a case worker for the Agency.

**{¶24}** On December 12, 2022, she was on call and received a report that there was a domestic violence incident between the appellant and N.M. At the time, four minor children, including P.J.M., would have resided with them. P.J.M. was home at the time, and the older three siblings were sent to their grandparents for the evening. Ms. Thompson attempted to do a home visit to check on the children but was unable to make contact. After she had left the residence, N.M. called her and told her that P.J.M. was not the same in the home with the appellant. He failed to provide any explanation for this. He said after officers left the home, the appellant began to yell and scream. N.M. wanted to file for emergency custody of P.J.M.

**{¶25}** In May of 2023, one of the appellant's children reported domestic violence between their grandparents. The child was fearful of the home. The grandfather had been reported walking around the house naked, not wearing any clothes. The Agency removed the children's siblings from their grandparents' home. At the removal, the grandmother admitted there were concerns about domestic violence and that she was scared of the grandfather. Both P.J.M. and D.M. were removed from the grandparents' home.

**{¶26}** Next, Aleisha Youngen testified that she is employed as an intake caseworker at the Agency. On December 13, 2022, she went to the home to meet with N.M. and the appellant regarding the allegations of the previous evening. N.M. stated that he had argued with the appellant. He left the home, and when he returned, the argument resumed. During Ms. Youngen's visit, the appellant hid in P.J.M.'s bedroom. When Ms. Youngen and the officers went to P.J.M.'s room, P.J.M. was alone in her crib. They found the appellant in the basement. The appellant refused to speak with Ms. Youngen because appellant was pregnant and was scared of high blood pressure. The appellant refused to take a drug screen.

**{¶27}** Ms. Youngen stated in her complaint that N.M. was crying, saying he could not continue with the appellant yelling and belittling him constantly. The appellant had told N.M. he could not take P.J.M. with him. Ms. Youngen then spoke with P.J.M.'s older siblings. They reported that there was constant arguing and fighting between T.M. and N.M. The appellant had threatened to stab all three of the older siblings. The appellant had attempted to push N.M. down the stairs. The appellant would call her children "lazy" and "bitches" while they were helping clean the home. They further told Ms. Youngen that the appellant would scream when the fighting started, and N.M. would pick up P.J.M. so that the appellant would not hit him. N.M. would use P.J.M. as a shield against the appellant's domestic violence. P.J.M. was one at the time. The fights between the appellant and N.M. would result in holes being punched and kicked in the wall.

**{¶28}** On December 27, 2022, Ms. Youngen returned to the home to go over the allegations with the appellant. The appellant and N.M. refused to take a drug screen that

day. The appellant appeared to be under the influence of drugs or alcohol when they met that day.

**{¶29}** On January 4, 2023, the Agency received a report that D.M. was born and transported to the hospital by an ambulance. He was born early and was suspected of having seizures and respiratory distress. The appellant had tested positive for methamphetamines on January 2, 2023. D.M. tested positive for amphetamines and methamphetamines. The hospital treated D.M. for withdrawal.

**{¶30}** On January 6, 2023, Ms. Youngen and Ms. Ballentine met with N.M. and the appellant to do an out-of-home safety plan for all of the children. The appellant was tested for drugs that day and tested positive for amphetamines and methamphetamines. The Agency filed a complaint regarding D.M. on January 20, 2023. The children were placed with the paternal grandparents.

**{¶31}** Next, Deputy Havranek testified he works for the Coshocton County Sheriff's Office as a deputy sheriff. On October 18, 2022, he was called to the home of N.M. and the appellant. N.M. was outside waiting for him to arrive. He requested that the deputy take the appellant into custody on a warrant. The appellant and N.M. had an altercation at some point, and she began jabbing at her stomach with a brush and items of that nature. She was pregnant with D.M. at the time, and P.J.M. was in the house. N.M. also indicated that incidents of domestic violence occurred prior to that date. The appellant came at him with a knife while he was holding P.J.M. She threatened to stab N.M. in his sleep. During an argument, the appellant attempted to hit N.M. with a glass plate. The appellant punched a television, causing it to shatter. The appellant threatened to stab him and the kids, and she shattered another television with a sweeper.

**{¶32}** The appellant then accused N.M. of throwing a playpen at her while she was eating mozzarella sticks. N.M. caused her to bruise and bleed (N.M. claims he only does that to stop her from attacking him and the kids). One of the daughters in the house said they saw the appellant threaten N.M. with a knife. No charges were filed by either the appellant or N.M. on that evening.

**{¶33}** Next, L.M., N.M.'s sister-in-law, testified that she had concerns about all the children in N.M. and the appellant's home. There was a concern about a lack of care for the children, domestic violence in the home, and bed bugs in the home. L.M. observed the bites from the bed bugs on all the children in the house. P.J.M.'s siblings told L.M. that they were forced to stay in their bedrooms and not be allowed to be part of the family in the living room. The appellant repeatedly threatened to cut their hair at night or stab them. They were afraid to go to sleep at night because of the bed bugs. They said that the appellant would hit N.M., and N.M. would push the appellant. L.M. received photographs of the abuse N.M. inflicted on the appellant. The appellant had previously attempted to assault L.M., which turned into the appellant assaulting N.M. when N.M. prevented the attack.

**{¶34}** The Agency placed P.J.M.'s older siblings in the care of L.M. from May of 2023 to September of 2023. L.M. and her husband scheduled a meeting with N.M. to check on his progress toward reunification and discuss his efforts to cover his children's expenses. N.M. failed to show. N.M.'s parents said he went to meet someone at a park. N.M. became distraught when L.M. arrived at the park. He said he was going to kill the Agency's caseworker and sped away in his vehicle.

**{¶35}** L.M. would have conversations with the older children. They would ask when N.M. would love them enough to leave the appellant. They said they feared for their lives with the appellant, and N.M. was mean to them when the appellant was present.

**{¶36}** Katie Barnett testified she is an ongoing caseworker with the Agency. She was assigned to this case on February 14, 2023. On her first visit with P.J.M. and her siblings, she was informed of the bed bugs in the home and their exposure to domestic violence.

**{¶37}** The Agency developed a case plan on March 21, 2023, for the children and their siblings. N.M. and T.M.'s case plan involved completing mental health services at CBHC, drug and alcohol services, completing an assessment, and following all recommendations. T.M. and N.M. must submit to announced and unannounced random drug screens, must attend domestic violence classes, attend individual and couples counseling, eliminate the bed bugs from their home, obtain and maintain employment to provide the basic needs of themselves and their children, attend supervised visits with the children, and attend medical appointments.

**{¶38}** N.M. attends CBHC but has not been consistent with the services going forward. He has backslid on his sobriety as he consumed alcohol recently, and he has attended domestic violence classes. There have been no reports of domestic abuse, but the children are not in the home. The Agency is aware of a domestic violence incident between N.M. and the appellant while on a video call with the children. He was removed from Child Parent Interaction Therapy due to his missed appointments. He restarted at some point, but Ms. Barnett does not know if he has been attending. They have left the house with the bed bugs, but their new residence has a leaking roof. Water damage is

still evident in the upstairs bedrooms. This will create mold. Eight months later, this remained unresolved.

{¶39} N.M.'s parenting visits have gone well. But the issue of domestic violence has been noted as a possibility still between N.M. and the appellant. The appellant is still very angry; she is very controlling in the relationship. She is argumentative in her parent coaching classes.

{¶40} N.M. attempted to see his children at a festival without a caseworker present. N.M. reached out to B.Y. Because of this, N.M. and the appellant are not allowed contact with the foster parents when they drop the children off for visitation.

{¶41} The appellant has attended CBHC but has not made significant progress. She took limited advantage of the services offered and recommended. She is not following through on recommendations for mental health and drug and alcohol counseling. Her attendance is limited and sporadic. The appellant stated that she would seek treatment elsewhere but has not provided any specifics to Ms. Barnett. The appellant has not engaged in parenting and domestic violence classes.

{¶42} When Ms. Barnett performs home visits, N.M. and the appellant are frequently sleeping through the day, and they often do not wake up. Ms. Barnett believes that It is not a suitable environment for a one-year-old and a three-year-old. The children's older siblings have had their medical needs neglected. They need dental care and eye appointments. These have been taken care of by their foster family. They did not have such care before being placed with their foster family. While N.M. and the appellant work the second and third shifts, someone needs to be available to meet the children's needs.

{¶43} Drug use is still a concern. D.M. was positive for methamphetamines at birth. His younger twin siblings were also exposed to prenatal methamphetamine use by the appellant. The appellant has not had any positive drug screens since June of 2023.

{¶44} The appellant's threat to stab the children's older siblings and "slit their throats" remains a concern for the Agency. A civil protection order was issued against the appellant to protect one of the children's older siblings. P.J.M., D.M., and their younger twin siblings cannot protect themselves if placed with the appellant and/or N.M. They are at significant risk of harm due to threats and ongoing domestic violence.

{¶45} The Agency originally placed the children with their paternal grandparents. The grandparents always had P.J.M. contained in a pack-and-play during Ms. Barnett's visits. Ms. Barnett was concerned about the cleanliness of their home, that the older siblings had to parent P.J.M., and that D.M.'s needs were not being met. Domestic violence was occurring between the grandparents, and the grandfather was often seen naked in the home, sometimes just in his underwear. There were allegations he would lie in bed with the older girls and watch pornography. The children were then placed with B.Y. and her husband.

{¶46} As of May of 2023, the parents did not have visitation with the children as they would not meet with Ms. Barnett regarding their case. They were not working on the case plan or communicating with her.

{¶47} On June 5, 2023, the appellant was incarcerated for failure to pay child support. She went to treatment in lieu of prison. She was in treatment until December 1, 2023. In June, the appellant tested positive for methamphetamines and amphetamines. She was pregnant with twins.

**{¶48}** N.M. began engaging with Ms. Barnett during the appellant's incarceration. He had to stop his visitations multiple times due to positive drug screens.

**{¶49}** The appellant and N.M. resumed visitation with the children. They were staying at the appellant's father's home. He was suffering from an illness. While at his home, N.M. was reportedly looking through his cabinets. The appellant's father's pain medication disappeared, and N.M. tested positive for morphine on September 6, 2023. N.M. tested positive for THC on September 14, 2023. During the course of the case, the children's older siblings requested that they not have contact with the appellant. The appellant and N.M. have been identified as unsafe people by all of the children's older siblings.

**{¶50}** Finally, the appellee testified that she is the guardian ad litem for the children. She said that the older siblings were very forthright about the abuse and neglect that happened in their parents' home. The older three children would pile into the same closet to sleep to be away from the bed bugs. They would stuff blankets under the door to try and keep them out. The appellant locked them out of the house in the winter. The neighbors had to take them in to get them warm. The appellant then threatened to kill the neighbor if that neighbor ever had contact with the older children again. The paternal grandfather told the appellee that during one altercation between N.M. and the appellant, the appellant jumped from a moving car and sustained injuries.

**{¶51}** While being placed with the paternal grandparents, an allegation arose of the grandfather watching pornography with the older siblings. The three older siblings shared two rooms, and the grandmother was unable to access them due to a knee injury. The children were removed from the care of their grandparents.

**{¶52}** Once the appellant was incarcerated and then in treatment, N.M. was in contact with the appellee a lot. He was good at working on the case plan. In July of 2023, he had a positive drug screen and had to stop visitation. The appellee told N.M. that he needed to have three negative tests to resume visitations and that it was important for reunification. The older siblings went to live with their aunt and uncle while N.M. was using. During that time, he threatened to kill the caseworker.

**{¶53}** The appellant began visiting when she was on leave from treatment. N.M. tested positive for morphine during this time, and there were issues with dishonesty when the appellant started her visits. When the appellant was released from treatment, the appellee had limited contact with N.M. The older siblings told the appellee that they wanted no contact with the appellant. They made clear that under no circumstances would they consider living with her. The older siblings felt very betrayed that N.M. did not protect them from the appellant.

**{¶54}** The appellee did a home visit with the children on January 17, 2024. They were bonded and attached to their foster family. Both P.J.M. and D.M. have long crying periods where they wake up crying on days that they have visitation with N.M. and the appellant.

**{¶55}** N.M.'s phone calls with the older siblings were not appropriate. He would complain about financial issues. They would then have to parent him.

**{¶56}** During N.M. and the appellant's visit with P.J.M. and D.M., they did bring appropriate equipment with them. The appellee did not notice any obvious parenting deficiencies.

{¶57} The appellee did a home visit at N.M. and the appellant's residence. There was an active roof leak that had been there a long time. There was concern about damage to the inside of the wall and ceiling. There would potentially be a mold problem. The appellee spoke with both N.M. and the appellant about reunification. N.M. said he wanted to be reunited with all seven of his children. The appellant said that N.M. lied about the domestic abuse. After telling N.M. and the appellant that the older siblings of the children refused to live with the appellant, the appellant got angry and stormed out of the room. It was clear that N.M. and the appellant did not have a plan in place for caring for the remaining four children under the age of five.

{¶58} The appellant has been arrested several times for failing to pay her child support. It is concerning that she cannot meet the needs of the children if they are placed with her. After the filing the permanent custody motion, the appellant was taken into custody on an active warrant.

{¶59} The appellant has admitted to not doing recommended counseling and classes. N.M. confirmed his use of alcohol. Most recently, during her visits, the appellant belittles N.M., rolls her eyes, and ignores him. She is short-tempered and demanding, and the visitation staff is concerned about the implications of that on the children.

{¶60} On December 3, 2024, the trial court granted permanent custody to the Agency.

{¶61} The appellant filed a timely notice of appeal and herein raises the following four assignments of error:

{¶62} "I. THE TRIAL COURT ERRED BY FINDING THAT THE MINOR CHILDREN 'CANNOT BE RETURNED TO PARENTS' AS SUFFICIENT TO FORM A

FINDING UNDER R.C. 2151.353(A)(4) AS IT IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

{¶63} "II. THE TRIAL COURT ERRED BY ADJUDICATING THE GUARDIAN AD LITEM'S MOTION FOR PERMANENT CUSTODY PURSUANT TO R.C. 2151.413 AS THE STATUTE SPECIFICALLY CONFINES MOTIONS FOR PERMANENT CUSTODY TO BE FILED BY A PUBLIC CHILDREN'S SERVICES AGENCY."

{¶64} "III. THE TRIAL COURT ERRED WHEN IT FOUND THAT PERMANENT CUSTODY WAS IN THE CHILDREN'S BEST INTERESTS, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶65} "IV. THE TRIAL COURT ERRED BY GRANTING PERMANENT CUSTODY TO THE COSHOCTON COUNTY JOB AND FAMILY SERVICES AS THE AGENCY HAD NOT DRAFTED A CASE PLAN SHOWING THAT THE AGENCY SOUGHT AN ADOPTIVE FAMILY FOR THE CHILDREN AND TO PREPARE THE CHILDREN FOR ADOPTION PURSUANT TO R.C. 2151.413(E)."

## I., III.

{¶66} In the appellant's first and third assignments of error, the appellant argues that the trial court's finding that the children cannot be returned to the parents is against the manifest weight and sufficiency of the evidence and that granting the Agency permanent custody is against the manifest weight of the evidence. We disagree.

{¶67} Both assignments of error implicate R.C. 2151.414, which authorizes a trial court to grant permanent custody to the Agency upon a finding, by clear and convincing evidence, that the children cannot be placed with either parent within a reasonable time

and that an award of permanent custody to the Agency is in the child's best interest. R.C. 2151.414. As such, they will be addressed together.

## STANDARD OF REVIEW

**{¶68}** The Ohio Supreme Court addressed the standard of review in permanent custody cases in the case of *In re Z.C.*, 2023-Ohio-4703:

Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, "by clear and convincing evidence, that it is in the best interest of the child" to do so and that any of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St.469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

We have described an appellate court's task when reviewing a trial court's application of the clear-and-convincing-evidence burden of proof as follows: "Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990), citing

*Ford v. Osborne*, 45 Ohio St. 1, 12 N.E. 526 (1887), paragraph two of the syllabus; *accord Cross* at 477, 120 N.E.2d 118.

\* \*

… sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*Id.* at ¶7-8, 11.

The Court went on to define sufficiency of the evidence and manifest weight as follows:

Sufficiency of the evidence and manifest weight of he evidence are distinct concepts and are " 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. We have stated that "sufficiency is a test of adequacy," *Thompkins* at 386, 678 N.E. 541, while weight of the evidence " 'is not a question of mathematics, but depends on its *effect in inducing belief* " (emphasis sic), *id.* at 387, 678 N.E.2d 541, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.* at 386, 678 N.E.2d 541.

But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against

the manifest weight of the evidence." *Eastley* at ¶12. When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered. *Id.* at ¶20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). " 'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Id.* at fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶13-14.

## ANALYSIS

**{¶69}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates that the trial court schedule a hearing and provide notice upon the filing of a motion for permanent

custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶70} R.C. 2151.414(B)(1) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that 1) it is in the best interest of the child to grant permanent custody to the agency; and 2) any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable period of time or should not be placed with the child's parents;

(b) the child is abandoned;

(c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services

agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶71} R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child. In this case, the trial court found that R.C. 2151.414(B)(1)(a) and (d) factors applied. P.J.M. and D.M. could not be placed with either parent within a reasonable time and had been in the temporary custody of the agency for more than twelve months of a twenty-two-month period.

{¶72} The trial court must also consider all relevant evidence before determining that the children cannot be placed with either parent within a reasonable time or should not be placed with the parents. R.C. 2151.414(E). The statute also provides that if the court makes a finding under R.C. 2151.414(E)(1)-(15), the court shall determine the children cannot or should not be placed with the parent. A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. See *In re William S.*, 1996-Ohio-182.

{¶73} R.C. 2151.414(E) states in pertinent part:

In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

* *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* *

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

* *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.33 or

2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

* *

(16) Any other factor the court considers relevant.

{¶74} In the case sub judice, sufficient evidence was presented that the appellant lost custody of multiple of the children's older siblings. The appellant has not provided support for the child or shown how she will be able to support the children upon their return. She has not consistently attended or followed through on any counseling or class recommendations as required by her case plan, she is still engaging in behavior which has led to domestic violence accusations, she has threatened the lives of her children and their father, she was arrested and incarcerated for failure to pay child support, she tested positive for controlled substances when she was pregnant with D.M., she tested positive again for controlled substances when she was pregnant with D.M.'s younger siblings, she ignored the needs of the children's siblings to the point they had to shut themselves in the closet with a blanket under the door to be kept from being bitten by bed bugs, on multiple occasions has engaged in domestic violence against N.M., on some of the occasions of domestic violence N.M. picked up P.J.M. to use as a human shield against the appellant's abuse, and she threatened the life of a neighbor for helping the children's older siblings after the appellant locked them out of the house in the winter.

Regarding the suitability of her home, although she moved from a home infested with bed bugs, her new residence had a substantial leak in the roof for months. The damage caused to the ceiling and drywall was not fixed in a reasonable period of time. While the appellant and N.M. have reported that they have jobs, they routinely sleep through the day, with the dog barking loudly, because they work the second and third shifts. They have not identified how they would ensure the children's needs are met during this time.

{¶75} The appellant's argument ignores all the evidence presented other than that focusing on the children's siblings. Then, it concludes that such evidence is insufficient for terminating her parental rights regarding P.J.M. and D.M. This just simply is not accurate. Based upon all of the foregoing evidence presented by the appellee, we find that there was sufficiently clear and convincing evidence for the trial court to find that, while the appellant made minimal efforts to engage in the case plan, she continuously and repeatedly failed to remedy the conditions that caused the children to be placed outside her home. Further, the evidence presented to the trial court sufficiently established the appellant's struggle with chemical dependency, her unwillingness to provide support for the children, and her inability to ensure the children have a safe and stable home. While she did somewhat engage with the services required in the case plan, she failed to complete and follow through on the recommendations. We find that the trial court did not err by finding that the children could not be placed with the appellant within a reasonable period of time or that they should not be placed with the appellant. The trial court's determination that granting the appellee's motion for permanent custody was in the best interest of the children was based on sufficient evidence and not against the manifest weight of the evidence.

**{¶76}** Accordingly, the appellant's first and third assignments of error are overruled.

## II.

**{¶77}** In the appellant's second assignment of error, the appellant argues that the trial court erred when it adjudicated the appellee's motion for permanent custody because it was filed by a guardian ad litem instead of the Agency. We disagree.

## ANALYSIS

**{¶78}** The Supreme Court of Ohio has found that a guardian ad litem has the authority to file and prosecute a motion for permanent custody. *In re C.T.*, 2008-Ohio-4570, ¶19. In that case, the Court concluded that two provisions allow the guardian ad litem to file motions for permanent custody:

**{¶79}** R.C. 2151.281(I) grants guardians ad litem with a general grant of authority to act in the best interest of the children. The guardian ad litem "shall perform whatever functions are necessary to protect the best interest of the child …and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court." *Id.*

**{¶80}** R.C. 2151.415(F) provides that "[t]he court, on its own motion or the motion of the agency or person with legal custody of the child, the child's guardian ad litem, or any other party to the action may conduct a hearing * * * to determine * * * whether any other dispositional hearing set forth in divisions (A)(1) to (5) of this section should be issued." *Id.*

**{¶81}** Pursuant to R.C. 2151.415(B), a dispositional order that permanently terminates parental rights must be conducted "in accordance with sections 2151.413 and

2151.414 of the Revised Code." Therefore, a permanent custody motion filed by a guardian ad litem is governed by R.C. 2151.414. Accordingly, the trial court did not err in adjudicating the motion for permanent custody filed by the appellee.

**{¶82}** The appellant's second assignment of error is overruled.

### IV.

**{¶83}** In the appellant's fourth assignment of error, the appellant argues the trial court erred by granting the appellee's motion for permanent custody as the Agency did not draft a case plan showing that the Agency sought an adoptive family for the children. We disagree.

### ANALYSIS

**{¶84}** The Supreme Court of Ohio has explicitly rejected this argument. R.C. 2151.413(E) "requires a children-services agency seeking permanent custody of a child to update the child's case plan to include adoption plans." The Supreme Court of Ohio has found the statute "does not require the agency to perform this action before the juvenile court rules on the motion for permanent custody." *In re: T.R.*, 2008-Ohio-5219, ¶8. The appellant's brief fails to distinguish the case at bar from *T.R.* Based on the clear holding in *T.R.*, we disagree with the appellant that the trial court erred by granting the appellee's permanent custody motion before the children-services agency filed a case plan outlining the adoption plans.

## CONCLUSION

{¶85} Based upon the foregoing, the decision of the Coshocton County Court of Common Pleas, Juvenile Division, is hereby, affirmed.

By: Baldwin, P.J.

Hoffman, J. and

Gormley, J. concur.